**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**In re:**

**DIVERSIFIED WIRE & CABLE, INC.,**

**Debtor.**

**Case No. 26-42632-mlo**
**Chapter 11, Subchapter V**
**Hon. Maria L. Oxholm**

---

# DEBTOR'S PLAN OF LIQUIDATION

## INTRODUCTION

Diversified Wire & Cable, LLC, as Debtor and Debtor in Possession in the above-styled case ("DWC" or the "Debtor"), by and through its attorneys, Strobl Stark PLLC, proposes the following Plan of Liquidation (the "Plan" or "Liquidating Plan") pursuant to 11 U.S.C. §§ 1190 and 1191. The Plan is presented to you to inform you of the proposed distribution of the Debtor's assets and to seek your vote to accept the Plan.

As a Creditor, your acceptance of this Plan is extremely important to the Debtor. You are encouraged to carefully review the full text of this Plan, including all exhibits and attachments, before deciding how to vote on the Plan.

In addition to casting your vote to accept or reject the Plan, you may object to confirmation of the Plan. If you wish to object, you must do so by **July 15, 2026.** Your ballot stating how you are voting on the Plan must be returned so that it is received by **July 15, 2026.** The ballot must be forwarded to Lynn M. Brimer

by either mailing such ballot to the following address: Lynn M. Brimer, Strobl Stark PLLC, 33 E. Long Lake Road, Ste. 125, Bloomfield Hills, Michigan 48304; or emailing the ballot to lbrimer@strobllaw.com.

A hearing on confirmation of the Plan is scheduled for **July 23, 2026, at 11:00 a.m.** The hearing shall be held **in person** in the Courtroom of the Honorable Maria Oxholm, United States Bankruptcy Court, Courtroom 1875, 211 W. Fort Street, Detroit, Michigan 48226. Your rights may be affected by this Plan. You should consider discussing the Plan with an attorney.

## ARTICLE I
## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1.1 Nature of the Debtor's Business

DWC has a national reputation as a manufacturer of custom fiber optic and copper cable assemblies. In addition to distribution and assembly, DWC provides a number of professional services to its customers including, among others, IT infrastructure design; public safety DAS (Distributed Antenna Systems) and BDA (Bi-Directional Amplifier) design and installation; wireless consulting and design services; assistance in designing and expanding CAD drafting and drawing services; and PDU (Power Distribution Unit) rack and stack pre-build and staging services.

### 1.2 History of the Business Operations of the Debtor

Dean J. Stanton is DWC's majority shareholder. Mr. Stanton began his career in the wire and cable industry shortly after graduating from high school when he took a position with a wire and cable distribution company in Texas. After returning to Michigan he incorporated his first wire and cable distribution company in 1988 which he successfully sold in 1996, merging it into a Delaware corporation and eventually selling his equity interest in the surviving company.

In 2001, Mr. Stanton incorporated Diversified Wire & Cable Distribution, Inc. (DWCD, Inc.), as a Michigan corporation, serving as its initial president and sole director. In 2002, DWCD, Inc. changed its name to Diversified Wire & Cable, Inc. ("DWCI"). In 2015, DWCI merged into Great Lakes Wire & Cable, Inc. ("GLWC"). The surviving entity then changed its name to Great Lakes Diversified Group, Inc. In May 2020, the Company changed its name a final time to its current name: Diversified Wire & Cable, Inc.

### 1.3 Events Leading to the Filing of the Debtor's Chapter 11 Case

Several factors contributed to the Debtor's decision to file for relief under Chapter 11, Subchapter V of the Bankruptcy Code. Over the course of the last several years, Debtor's then first secured lender, Bank of Ann Arbor ("BoAA") modified its formula allowing for draws under its loan documents, which effectively reduced the credit and cash available to DWC. As a result, DWC had,

from time-to-time, insufficient resources to fund purchases needed to fulfill customer orders. Consequently, DWC was compelled to turn away opportunities that otherwise would have generated significant margins to fund future growth. In turn, this led to an overall reduction in DWC's annual revenue and its ability to generate new sales. While DWC has not turned away any of its steady and reliable customers, it been forced to turn down certain projects, missing out on revenue that would have helped support DWC's overall production and profitability.

Increased costs, supply chain issues, and general instability in the economy and the market have also led to a broad reduction in both orders and profit margins. With the debtor in possession credit facility from Bridge (the "Bridge DIP Loan"), DWC anticipated resuming production on a number of pending purchase orders that had been stalled. It was hoped that the Bridge DIP Loan would lead to increased cash flow and allowing for growth in sales with higher margins that would sustain post-petition operations and allow for a successful reorganization.

### 1.4 Legal Structure of the Ownership of the Debtor

The Debtor is a Michigan limited liability company. On the Petition Date, DWC had two classes of issued stock, Class A Voting and Class B Non-Voting, owned as follows:

| Shareholder | Class | Date Acquired | Number of Shares |
|---|---|---|---|
| Dean J. Stanton, Trustee | Class A Voting | 12/11/2015 | 4,590 |
| Dean J. Stanton, TTEE | Class A Voting | 6/30/2017 | 5,100 |
| Andrew J. Stanton | Class A Voting | 12/31/2020 | 3,890 |
| Dean G. Stanton | Class A Voting | 12/31/2020 | 3,890 |
| Dean J. Stanton, TTEE | Class A Voting | 12/31/2020 | 1,979 |
| Total: | | | 19,449 |
| | | | |
| Oscar A. Ferrari | Class B Non-Voting | 12/11/2015 | 490 |
| Andrew J. Stanton | Class B Non-Voting | 12/31/2020 | 102 |
| Dean G. Stanton | Class B Non-Voting | 12/31/2020 | 102 |
| Dean J. Stanton, TTEE | Class B Non-Voting` | 12/31/2020 | 306 |
| Total: | | | 1000 |

### 1.5 <u>Debtor's Management and Employees</u>

From 2019 through 2022, Mr. Stanton was the sole officer and director of DWC. In 2023, his sons, Dean G. Stanton, Jr. ("Dean, Jr."), and Andrew Stanton, became involved with the business and assumed positions of responsibility in the company. On the Petition Date, Mr. Stanton was the Debtor's secretary and chief

operating officer and sole director. Dean, Jr., is the Debtor's president and treasurer.

In addition to Mr. Stanton and Dean, Jr., on the Petition Date, the Debtor employed 14 employees in its Sterling Heights facility and 14 employees in its Georgia Facility. All employees were full time. Since the Petition Date, the Debtor has closed its Georgia facility and terminated all of its 14 employees. The Debtor currently maintains 14 employees, including Mr. Stanton and his son, in its Michigan facility.

### 1.6 Debtor's Assets/Liquidation Analysis

In order to evaluate the Plan, Creditors must consider the liquidation analysis of the Debtor's assets. On the Petition Date, DWC's assets were chiefly made up of the following personal property (i) equipment and vehicles used in the business operations; (ii) a security deposit held by the DWC's landlords; (iii) work in process; (iv) inventory; and (iv) accounts receivable, as follows:

| | | |
|---|---|---|
| i. | Vehicles and Equipment : | $ 196,043.14 |
| ii. | Security Deposit: | $ 45,778.00 |
| iii. | Inventory: | $ 650,000.00 |
| iv. | Accounts Receivable: | $ 308,362.03 |
| v. | Goodwill and ongoing operations: | Unknown |
| | TOTAL: | $1,200,183.17 |

On the Petition Date, all of Debtor's personal property assets secured the Debtor's obligations to BoAA and Susan Stanton, as set forth below, pursuant to blanket security interests recorded with the Michigan Secretary of State.

The Debtor's liquidation analysis is attached as **Exhibit E**.

### 1.7 Debtor's Liabilities and Prepetition Transactions

On the Petition Date, two creditors held all asset secured interests in DWC's pre-petition cash collateral ("Cash Collateral") and tangible assets: Bank of Ann Arbor (BoAA) and Susan K. Stanton, as the Trustee of the Susan K. Stanton Revocable Living Truste UAD 11/3/2015, as amended ("SStanton"). In addition, the Debtor had several secured creditors with claims secured by an interest in one of the Debtor's vehicles.

#### 1.7.1 Secured Claims

On the Petition Date, two creditors held secured interests in DWC's pre-petition cash collateral ("Cash Collateral") and tangible assets: Bank of Ann Arbor (BoAA) and Susan K. Stanton, as the Trustee of the Susan K. Stanton Revocable Living Truste UAD 11/3/2015, as amended ("SStanton"). Both BoAA and Stanton hold all asset security interests in DWC's assets.

#### 1.7.1.1 **Bank of Ann Arbor Debt**

Prior to the Petition Date, DWC entered into a line of credit with mBank Business Credit ("mBank"), the predecessor to BoAA, as follows:

i. **MBank Loan.** On August 11, 2021, MBank entered into a Second Amended and Restated Loan and Security Agreement with DWC, extending, restating and amending the Amended and Restated Loan Agreement dated September 6, 2017 (collectively, the "mBank Loan Documents") which provided for a revolving line of credit in the maximum amount of $5,000,000.

ii. **BoAA Amendment to the mBank Loan Documents.** On August 7, 2024, DWC entered into Amendment No. 3 to the Second Amended and Restated Revolving Credit Loan Note, as amended by Amendment No. 1 and Amendment No. 2 (the "BoAA Loan Documents")

(the amount due under the BoAA Loan Documents shall be referred to as the "BoAA Obligations")

iii. **Security for Repayment of the BoAA Obligations.** As security for the repayment of the BoAA Obligations, DWC and I entered into the following:

i. **The Guaranty.** On September 6, 2017, Mr. Stanton entered into an Amended and Restated Continuing Guaranty in favor of mBank with respect to the indebtedness under the mBank Loan Documents. On August 7, 2024, individually and as the Trustee of the Dean J. Stanton Revocable Living Trust Agreement dated July 23, 1999, as amended on November 8, 2000, and as amended and restated on November 3, 2015, executed an Commercial Guaranty dated August 16, 2017, I executed an Affirmation of Guaranty in connection with the execution of the BoAA Loan Documents (the "Guaranty").

ii. **UCC Perfection.** BoAA perfected its interest in DWC's assets by filing a series of UCC-1 Financing Statements with the Michigan Department of State – Uniform Commercial Code (the "BoAA UCCs").

As of the Petition Date, the balance due on the BoAA Obligations totaled approximately $275,000.00, plus accruing interest, fees and costs. On about March 16, 2026, the BoAA debt in the amount of $295,346.00 was satisfied with funds advanced by Bridge under the Debtor in Possession loan and pursuant to the Interim Order (A) Authorizing Debtor-in-Possession Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364; (B) Granting Liens, Security Interests, and Superpriority Claims; (C) Authorizing Use of Cash Collateral and Granting Adequate Protection, and (D) Modifying the Automatic Stay. [ECF No. 37]

**1.7.1.2 <u>The Stanton Debt</u>**

On March 4, 2026, Stanton entered into a loan agreement with Bridge Business Credit, LLC ("Bridge") in the amount of $765,000 (the "Bridge Stanton Loan") secured by her personal residence. Stanton advanced funds from the Bridge Stanton Loan to DWC and entered into a Promissory Note in the amount of $493,267.03 and an All-Asset Security Agreement (the "Stanton Loan Agreement") with DWC (the "Stanton DWC Loan"). Stanton perfected her security interest by filing a UCC-1 Financing Statement with the Michigan

Department of State – Uniform Commercial Code Division on March 4, 2026 (the "Stanton Lien"). The Stanton DWC Loan provides for the payment of interest only for the first 12 months of the Loan, beginning April 1, 2026 (the "Stanton Payment"). Stanton agreed to subordinate the Stanton Lien to the lien(s) of Bridge in the event Bridge was approved as the Debtor-in Possession Lender.

**1.7.1.3 <u>The Vehicle Loans</u>**

On the Petition Date, the Debtor had five creditors with secured claims in vehicles titled to the Debtor as follows:

(i) Chrysler Capital had a secured claim in the amount of $31,795 in a 2021 Jeep Gladiator (the "Jeep"). Unless the successful purchaser Debtor's assets purchases the Jeep, the Debtor plans to surrender the Jeep as soon as reasonable after the closing on the sale.

(ii) Ford Motor Credit had a secured claim in two 2020 Ford transit vans in connection with two separate installment sale agreements. The Debtor sold one vehicle with authorization from the Court and satisfied the secured claim at that time. The balance due on the remaining transit van has been satisfied during the course of this proceeding.

(iii) Ally Financial held a secured claim in the amount of approximately $90,341.58 on the Petition Date secured by an interest in a 2025 Ford F150 Truck (the "F150"). In the event the successful bidder in connection with sale of the Debtor's assets purchases the F150, the secured claim of Ally Financial will be paid through the sale process. If not, the F150 will be surrendered at a reasonable time after the closing date.

(iv) Toyota Credit Corp. held a secured claim in the amount of approximately $40,819.83 secured by an interest in a 2023 Toyota 4Runner (the "4Runner"). In the event the successful bidder in connection with sale of the Debtor's assets purchases the 4Runner, the secured claim of Toyota Credit Corp. will be paid through the sale process. If not, the 4Runner will be surrendered at a reasonable time after the closing date.

(v) Huntington Bank held a secured claim in the amount of approximately $36,608.13 secured by an interest in a 2022 Ford Bronco. During the course of this proceeding, the Ford Bronco was sold with Court authorization and the claim of Huntington was satisfied from the sale proceeds.

**1.7.2 <u>Priority Claims</u>**

On the Petition Date, the Debtor's unpaid priority claims consisted of the unpaid wage claims of its employees entitled to priority under section 507(a)(4) of the Bankruptcy Code and unpaid sales tax due to the State of Michigan and the State of Ohio. The Debtor has not paid $20,576.91 of the prepetition wages due to the following employees Dean Stanton, Dean Stanton, Jr., and Andrew Stanton that are entitled to priority under section 507(a)(4).

**1.7.3 Unsecured Claims**

The Debtor's unsecured claims are comprised of the Debtor's trade claims due to its vendors, and the penalties and interest on penalties due on the unpaid sales taxes. The Debtor's general unsecured claims total approximately $2,719,148.47.

**1.7.4 Guaranteed Debt**

On the Petition Date, the Debtor had no obligations it had guaranteed for another party. Mr. Stanton, Susan Stanton and Dean Stanton, Jr. guaranteed the Debtor's obligations to Bridge.

**1.8 Current and Historical Financial Conditions**

The current financial records of the Debtor are believed to be reliable. A summary of three (3) years of financial data is attached hereto as **Exhibit A,** consisting of the Debtor's prior three full calendar years beginning with the tax year ending December 2023 through 2025. A summary of the projected post-

confirmation costs that will be needed to complete the final wind down of the Debtor is attached as **Exhibit B**.

The Debtor continued to operate through the Chapter 11 for the benefit of its customers and creditors. The Debtor filed monthly operating reports reflecting post-petition income and expenses. The Debtor's Operating Statements for each month post-petition attached as **Exhibit C.** A summary of Debtor's Post-Petition Income and Expenses as reported on the post-petition operating reports is attached as **Exhibit D**.

### 1.9 Significant Events During the Bankruptcy Case

#### 1.9.1 Cash Collateral and DIP Financing

In order to meet customer requirements and to satisfy executory contract obligations and preserve the value of its assets for creditors and enhance the collection of its accounts receivable, it was necessary for the Debtor to obtain post-petition secured financing from Bridge and to use cash collateral securing the Bridge DIP Loan. On March 12, 2026, Debtor filed its First Day Motion (A) Authorizing Debtor In Possession to Obtain Postpetition Secured Financing Pursuant to Sections 105(a), 361, 363, and 364; (B) Granting Liens, Security Interests and Superpriority Claims; (C) Authorizing Use of Cash Collateral and Granting Adequate Protection; (D) Modifying the Automatic Stay and (E) Scheduling a Final Hearing (the "DIP Financing Motion"). [ECF No. 10] On

March 16, 2026, the Court conducted a hearing and entered an Interim Order (A) Authorizing Debtor in Possession to Obtain Postpetition Financing Under §§ 105, 361, 362, 363, and 364; (B) Granting Liens, Security Interest and Superpriority Claims; (C) Authorizing Use of Cash Collateral and Granting Adequate Protection; and (D) Modifying the Automatic Stay (the "Interim DIP Order"). [ECF No. 37]. The Interim DIP Order, among other relief, authorized the Debtor to enter into a post-petition secured line of credit with Bridge up to a maximum amount of $2,000,000.00, authorized the payment of the BoAA Debt in full and provided adequate protection to Bridge as the post-petition lender and to Stanton as a prepetition secured lender, thereby enabling the Debtor to continue to operate post-petition. No objections were filed to the Interim DIP Order. Pursuant to the its terms, BOAA was paid in full shortly after entry of the Interim DIP Order.

On April 1, 2026, the Subchapter V Trustee, the United States Trustee, Bridge, and the Debtor entered a Stipulation for the Entry of the Final Order (A) Authorizing Debtor in Possession to Obtain Post-petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364; (B) Granting Liens, Security Interests, and Super priority Claims; (C) Authorizing Use of Cash Collateral and Granting Adequate Protection; and (D) Modifying the Automatic Stay. [ECF No. 68] On April 2, 2026, the Court entered the Stipulation for the Entry of the Final Order (A) Authorizing Debtor in Possession to Obtain Post-petition Financing Pursuant to 11

U.S.C. §§ 105, 361, 362, 363, and 364; (B) Granting Liens, Security Interests, and Super priority Claims; (C) Authorizing Use of Cash Collateral and Granting Adequate Protection; and (D) Modifying the Automatic Sta (the "Final Order") [ECF No. 72]

Initially, the Debtor was able to fund operations and continue to service customers. However, Debtor's cash flow was significantly depleted by the out of pocket expenses associated with closing its Georgia facility and moving from the Sterling Heights facility to a new location in Rochester Hills. Additionally, the downtime associated with the move delayed invoicing to customers, which negatively impacted the borrowing based under the Bridge Loan DIP. This left this Debtor unable to continue to sufficiently purchase the inventory needed to meet customer orders.

The Debtor was successful in finding a party interested in funding vendor purchase orders. Tripathi Capital Holding, LLC ("TCH"), a Michigan limited liability company, has agreed to fund vendor invoices in order to purchase inventory to meet customer orders pursuant to a Purchase Order Financing Agreement with the Debtor and an Intercreditor Agreement with Bridge and the Debtor (collectively, the "PO Financing"). On June 2, 2026, the Debtor filed a Motion to Approve Agreement Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364; and Fed R. Bankr. P. 2002, 4001(c) and (d), for Entry of an Interim Order (I)

Modifying Final Order Authorizing Debtor in Possession to Obtain Postpetition Financing and Granting Other Relief, (II) Approving Additional Financing Agreements and (III) Scheduling Final Hearing. Bridge, Susan Stanton and the Subchapter V Trustee stipulated to the relief requested and the United States Trustee did not object. The Motion was served and a hearing was conducted on June 8, 2026. On June 8, 2026, the Court entered an Interim Order (I) Modifying Final Order Authorizing Debtor in Possession to Obtain Postpetition Financing and Granting Other Relief, (II) Approving Additional Financing Agreements and (III) Scheduling Final Hearing (the "Interim PO Financing Order). [ECF No. 155] The final hearing is scheduled for June 25, 2026. Pursuant to the Interim PO Financing Order, TCH began funding vender orders on June 8, 2026.

**1.9.2 <u>Cessation of Georgie Operations and Termination of the Lease</u>**

Prior to the Petition Date, Debtor maintained a facility in Gainesville, Georgia. The Debtor began winding down the operations in Georgia shortly after the Petition Date. Other than three employees who agree to remain to assist with the wind down, all employees were terminated on about March 31, 2026.

On April 21, 2025, the Debtor filed a Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 363(b) and (f), and Fed. R. Bankr. P. 2002, 9006, 6004, and L.B.R. 6004-1 (1) Approving the Sale of Property Outside the Ordinary Course of Business Free and Clear of Liens, Claims, Encumbrances, and Interests through a

Private Sale to IEWC, Corp, and Transferring Liens to Proceeds of Sale; and (2) Granting Related Relief (the "IEWC Sale Motion"). [ECF. No. 110] Pursuant to a request for a shortened notice period, on May 7, 2026, the Court scheduled an expedited hearing on the IEWC Sale Motion and set May 5, 2026 as the objection deadline of May 5, 2026. [ECF No. 112] The IEWC Motion sought approval of a private sale of the inventory and equipment used at the Georgia facility that was no longer necessary to the Debtor's operations. No objections were filed and the Debtor submitted a Certification of Non-Response. [ECF No. 135] The Court entered an Order Granting the IEWC Sale Motion on May 7, 2026. [ECF No. 138]

In connection with the cessation of operations and the sale of the equipment and inventory, on April 30, 2026, the Debtor entered into a stipulation for the relief from stay with the landlord for the Georgia location, Robert M. Hagen. [ECF 125] The stipulation terminated the stay, surrendered the property to the landlord and resolved any claim the landlord may have against the Debtor's estate. The Order Terminating the Automatic Stay was entered on May 1, 2025. [ECF No. 127]

**1.9.3 <u>Sale of Vehicles</u>**

On April 21, 2026, Debtor filed a Motion for Entry of an Order (1) Approving the Sale of Property Outside the Ordinary Course of Business free and Clear of All Liens, Claims, Interests, and Encumbrances Through a Private Sale to Carvana Co., and Transferring Liens to Proceeds of Sale, and (2) Granting

Related Relief seeking approval of the sale of a Ford Cargo Van and the Debtor's Ford Bronco (the "Carvana Sale Motion"). [ECF No. 113] Pursuant to a request for a shortened notice period, on May 7, 2026, the Court scheduled an expedited hearing on the Carvana Sale Motion and set May 5, 2026 as the objection deadline of May 5, 2026. [ECF No. 115] No objections were filed to the Carvana Sale Motion and the Debtor submitted a Certification of Non-Response. [ECF No. 135]. The Court entered an Order Granting the Carvana Sale Motion on May 7, 2026. [ECF No. 137] As set forth above, the claims of the creditors secured by the vehicles that were sold was satisfied at the time of the sale.

#### 1.9.4 Termination of Wisconsin Lease

On April 22, 2026, the Debtor filed a Motion to Reject Lease Agreement with PGI Sunset Investments, LLC as of May 15, 2026 (the "Motion to Reject"). [ECF No. 116] No objections were filed with respect to the Motion to Reject. On June 9, 2026, the Debtor filed a Certification of Non-Response. [ECF No. 158] Also on June 9, 2026, the Court entered the Order authorizing the rejection of the lease agreement with PGI Sunset Investments, LLC as of May 15, 2026. [ECF 159]

#### 1.9.5 Assumption of Executory Contracts

The Debtor filed motions to assume the following executory contracts: (i) EDI Agreement with Kleinschmidt, Inc., (ii) a Master Services Agreement with

Antares Technology Solutions, LLC d/b/a Centaris ("Centaris"), and (iii) a vehicle lease agreement with Ford Motor Credit (the "Assumption Motions"). [ECF Nos. 53, 91 and 49, respectively] No objections were filed to the Assumptions Motions and the Debtor filed a certificate of no response with respect to each motion. The Court entered orders authorizing the Debtor to assume each of the contracts at issue in the Assumption Motions. [ECF Nos. 100, 130 and 98, respectively].

**1.9.6 Assumption of Lease with 1837 Enterprise, LLC**

On March 23, 2026, the Debtor filed a Motion to Assume Lease Agreement with 1837 Enterprise, LLC for the space at which Debtor currently conducts its business. [ECF NO. 51] No objection or other response was filed with respect to the Motion to Assume the Lease Agreement with 1837 Enterprise, LLC. The Debtor filed a Certificate of No Response on April 16, 2026 [ECF No. 95] and on the same day the Court entered the Order authorizing the assumption of the Debtor's lease. [ECF No. 99]

**1.8.6 The Sale of Debtor's Remaining Assets**

The Debtor is in the process of finalizing an Asset Purchase Agreement (the "Purchase Agreement") with DWC, LLC, a Michigan limited liability company and an affiliate of TCH, for the sale of the remaining assets of the Debtor, including, but not limited to its equipment, furniture and fixtures, executory contracts, unpaid accounts receivable generated using funds from TCH, and

Debtor's ongoing work in process. The purchased assets as set forth in the Purchase Agreement does not include the accounts receivable existing on the Petition Date or generated without the use of TCH funding. The Purchase Agreement provides for the full satisfaction of the Bridge secured claim and the payment of administrative fees of the Debtor up to an unagreed amount as of the filing of this Plan.

The Debtor anticipates filing a motion to approve bid procedures in connection with the proposed sale of its assets to DWC, LLC pursuant to Section 363 prior to confirmation. The Debtor intends to market its assets through appropriate industry publications and websites. In the event the Debtor receives competing offers for the purchase of its assets, the Debtor will conduct an auction. It is anticipated that the closing on the sale will occur before the Effective Date of this Plan.

**1.10. Projected Recovery of Avoidance Actions**

**1.10.1 Preference Claims**

The Debtor is not aware of any potential claims under section 547 of the Bankruptcy Code for the benefit of the Debtor's estate and creditors. During the 90 days prior to the Petition Date, the majority of Debtor's vendors had placed the Debtor on a cash in advance of a cash on delivery requirement. Consequently, the payments made during the 90 days prior to the Petition Date were either not on

account of past due debt or were a contemporaneous exchange. All other payments made to creditors during the 90 days prior to the Petition Date were ordinary course payments, prepayments, or subject to the new value exception.

### 1.10.2 Insider Transactions

The Debtor's insiders consist of Dean J. Stanton, Susan Stanton, Dean G. Stanton, Jr., Andrew Stanton and Oscar A. Ferrari. During the twelve months prior to the Petition Date, the distributions made to the Insiders were ordinary course compensation payments, ordinary course reimbursements of ordinary course rental payments. There have been no post-petition transfers outside the ordinary course of business. The Debtor is not aware of any preferential transfers pursuant to 11 U.S.C. §547 within one year of the Petition Date or fraudulent transfers to the Debtors insiders during the six years prior to the Petition Date.

## ARTICLE II
## SUMMARY OF THE PLAN

This Plan of Liquidation proposes to pay the Debtor's creditors from the proceeds of the sale of Debtor's assets to DWC, LLC and the proceeds from the collection of Debtor's remaining prepetition accounts receivable and the postpetition accounts receivable generated without using any of the PO Financing. The Plan establishes three (3) groups of unimpaired creditors and eight (8) classes of impaired claims. The Plan provides for full payment in cash of (a) the claims of

the administrative creditors, (b) the claims of Bridge in connection with the post-petition financing, and (c) the secured claims of TCH in connection with the PO Financing. The administrative claim of TCH in connection with it's PO Financing will be paid from the accounts receivable generated through the PO Financing. In the event DWC, LLC is not the successful bidder at an auction of the Debtor's assets, TCH's secured claim will be paid in full from the proceeds of the sale. SStanton's claim will be paid from any excess proceeds from the sale of the Debtor's assets and the collection on the prepetition accounts receivable to the extent such proceeds are available for distribution. The priority tax claims and the unpaid prepetition wage claims entitled to priority under section 507(a)(4) ((a), (b), and (c), will be paid in full if proceeds are available. Debtor's general unsecured creditors, including the Debtor's trade creditors, shall receive a distribution from the available funds in Debtor's estate after payment in full of the Group Claims, the TCH claims, the secured claims of SStanton and the claims entitled to priority. The Debtor's equity security holders will receive no recovery under this Plan.

All creditors and equity security holders should refer to Articles III through V of this Plan for information regarding the precise treatment of their respective claims and interests. Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.).

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS

**3.1 Unimpaired Interests**

**3.1.1 Group I:** Group I shall consist of administrative claims, including professional fees incurred during the Chapter 11 proceeding, which shall be paid in full, in cash, on the entry of an order approving such fees or as soon thereafter as funds become available.

In the event any of the Debtor's trade vendors assert an unpaid administrative claim, such vendor(s) should file a request for an administrative expense claim as set forth in Article XVI.

Debtor anticipates that on the Confirmation Date, Professional Fees will be due to Debtor's counsel, Strobl PLLC ("Strobl"), in the approximate amount of $120,000.00 and to Debtor's consultant DWH, LLC, in the amount of $60,000.00.

The fees of the Subchapter V Trustee shall be paid in full as an administrative claim. The Debtor estimates the Subchapter V Trustee's fees will be in the approximate amount of $25,000.00.

**3.1.2 Group II:** Group II shall consist of the Debtor in Possession financing claim of Bridge in the approximate amount of $559,196.67. The Group II claim shall be paid in full from the proceeds of the sale of the Debtor's assets. The Group II claim of Bridge is unimpaired.

**3.1.3 Group III:** Group III consists of the secured post-petition claim of TCH in connection with the PO Financing. The Group III claim of TCH will be paid as follows:

3.1.3.1 In the event DWC, LLC is the successful purchaser of the Debtor's assets, the TCH secured administrative claim will be paid from the post-confirmation collections by DWC, LLC of the accounts receivable funded by the PO Financing.

3.1.3.2 In the event DWC, LLC is not the successful purchaser of the Debtor's assets, the secured claim of TCH will be paid in full from the proceeds of the sale of Debtor's assets.

**3.2 Impaired Classes**

**3.2.1 Class I:** Class I shall consist of the unpaid cure amounts due to executory contract holders whose contracts have been assumed. The Debtor does not believe there will be any unpaid Class I claims on the Confirmation Date. To the extent there are any unpaid Class I claims on the Confirmation Date, such claims will be paid in full from the excess sale proceeds.

**3.2.2 Class II:** Class II shall consist of the secured claim of SStanton in the approximate amount of $493,267.03.

3.1.2.1 The secured claim of SStanton shall be paid from the excess proceeds from the sale of the Debtor's assets, to the extent there are excess

proceeds available for distribution, and from the collection of the Debtor's prepetition accounts receivable that remain unpaid on the closing date of the sale of the Debtor's assets.

3.1.2.2 The Class II claim shall continue to accrue interest at the agreed upon rate.

3.1.2.3 The Class II claim is impaired.

**3.2.3** **Class III:** Class III shall consist of the secured claim of Ally Financial. The Ally Financial claim is secured by a 2025 F150 Ford Truck. (the "F150").

3.2.3.1 In the event the successful bidder purchases the F150, the Class III claim of Ally Financial shall be paid in full at closing or pursuant to the terms of the installment agreement

3.2.3.2 In the event the successful bidder does not purchase the F150, it will be surrendered to Ally Financial as soon as reasonable after the closing date on the sale.

3.2.3.3 The Class III claim shall continue to accrue interest at the agreed upon rate.

3.2.3.4 The Class III claim is impaired.

**3.2.4.** **Class IV:** Class IV shall consist the secured claim of Toyota Credit Corp. which is secured by a 2023 Toyota 4Runner (the "4Runner").

3.2.4.1 In the event the successful bidder purchases the 4Runner, the Class IV claim of Toyota Credit Corp. shall be paid in full at closing or pursuant to the terms of the installment agreement

3.2.4.2 In the event the successful bidder does not purchase the 4Runner, it will be surrendered to Toyota Credit Corp. as soon as reasonable after the closing date on the sale.

3.2.4.3 The Class IV claim shall continue to accrue interest at the agreed upon rate.

3.2.4.4 The Class IV claim is impaired.

**3.2.5** **Class V:** Class V shall consist the secured claim of Chrysler Capital which is secured by a 2021 Jeep Gladiator (the "Jeep").

3.2.5.1 In the event the successful bidder purchases the Jeep, the Class V claim of Chrysler Capital shall be paid in full at closing or pursuant to the terms of the installment agreement.

3.2.5.2 In the event the successful bidder does not purchase the Jeep, it will be surrendered to Chrysler as soon as reasonable after the closing.

3.2.4.3 The Class V claim shall continue to accrue interest at the agreed upon rate.

3.2.5.4 The Class V Claim is impaired.

**3.2.6 Class VI:** Class VI shall consist of the priority claims of the State of Michigan and the State of Ohio for unpaid prepetition sales tax.

3.2.6.1 The Class VI claims shall be paid from the excess proceeds of the sale after the unimpaired claims and the Class I, Class II, Class III, Class IV and Class V secured claims are paid in full.

3.2.6.2 The Class VI claims shall continue to accrue interest after the Confirmation Date at the applicable statutory rate.

3.2.6.3 The Class VI claims are impaired.

**3.2.7 Class VII:** Class VII shall consist of the allowed general Unsecured Claims of Creditors of the Debtor, including the Debtor's trade creditors and the non-priority penalty and interest claims of the taxing authorities. On the Petition Date, Debtor's trade vendors' claims totaled approximately $2,719,148.00.

3.2.7.1 The Class VII claims shall be paid from the excess proceeds available from the sale of the Debtor's assets and the collection of its accounts receivable after the payment in full of all Group I, Group II, and Group III Claims, the wind down expense as set forth in **Exhibit B**, and the Class I, Class II, Class III, Class IV, Class V and Class VI claims.

3.2.7.2 In the event there are excess proceeds available for distribution to the Class VII creditors, such proceeds will be distributed to the Class VII creditors on a pro-rata basis.

3.2.7.3 The Class VII creditors shall not receive interest on their claims.

3.2.7.4. The Class VII creditors are impaired.

3.2.7.5 Any Class VII General Unsecured Claim that was identified in the Debtor's schedules as disputed, unliquidated, or contingent in the Debtor's Schedules shall be deemed disallowed unless such Creditor holding a claim identified as disputed, unliquidated, or contingent has timely filed a Proof of Claim.

**3.2.8** **Class VIII:** Class VIII shall consist of the Debtor's shareholders.

3.2.8.1 The Class VIII interests shall be deemed cancelled as of the Effective Date of this Plan.

3.2.8.2 The Class VIII interests will receive no distribution under this Plan.

3.2.8.3 The Class VII interests are impaired.

The Debtor shall continue to exist as a Michigan corporation, and as a Liquidating Debtor for the limited purposes of completing the obligations under this Plan.

Payments to be made pursuant to this Plan shall be from funds derived from the liquidation of the Debtor's assets.

The Debtor will not make any payments and will not incur any debts unless the debts and the payments comply with the terms and conditions of this Plan.

## ARTICLE IV
## EXECUTORY CONTRACT CLAIMS

The Debtor assumed certain executory contracts as set forth in Article I and, to the extent a purchase requests, will assign its rights under the assumed contracts to the successful purchaser. The Debtor will propose the assumption and assignment of certain customer contract in its motion to approve bid procedures for the sale of its assets.

All executory contracts not specifically assumed shall be deemed rejected.

Any Creditor who has a Claim as a result of any rejected executory contract shall have thirty (30) days after the Confirmation Date to file a Proof of Claim, failing which such Claim shall be disallowed in its entirety.

The Debtor may file an objection to any Proof of Claim filed pursuant to this Article IV in accordance with Article XVI.

## ARTICLE V
## FUNDING AND IMPLEMENTATION OF THE PLAN

**5.1 Funding of the Plan**. Pursuant to section 1190 of the Bankruptcy Code, the Debtor must show that it will have sufficient revenue to make the payments required by the Plan. The estate has generated revenue to fund the distributions to creditors from the sale of its assets and the assumption and

assignment of its executory contracts with customers, and the collection of its outstanding accounts receivable not sold to the successful purchaser. If all the impaired creditors vote to accept the Plan, the Debtor shall fund the obligations of the Plan pursuant to its terms. If the impaired creditors do not vote to accept the Plan, the Debtor reserves the right to amend the Plan to address the treatment of the impaired creditors.

Upon the Effective Date, unless otherwise released by the Plan, the Liquidating Debtor shall have, and is hereby assigned standing to pursue any and all Causes of Action, including Avoidance Actions, that have not been fully liquidated as of the Effective Date.

**5.2 Termination of the Subchapter V Trustee**.

**5.2.1** If the Plan is confirmed under section 1191(a) of the Bankruptcy Code, the Subchapter V Trustee shall continue to exercise powers and perform those duties specified in section 1183 of the Bankruptcy Code through substantial consummation of the Plan at which point her services shall terminate.

**5.2.2** If the Plan is confirmed under section 1191(b) of the Bankruptcy Code, the Subchapter V Trustee shall not be terminated until she has performed such duties as are described in Sections 1183 and 1194 of the Bankruptcy Code and such other duties as may be assigned by the Bankruptcy Court prior to the Effective Date.

**5.3. <u>Post Confirmation Services to the Debtor</u>.** Any services performed or expenses incurred by any professional on behalf of the Debtor or the Liquidating Debtor with respect to this Case after the Effective Date shall not be subject to the prior review and approval of the Court. All fees and expenses of the Liquidating Debtor arising after the Confirmation Date shall be billed directly to the Liquidating Debtor and shall be paid by the Liquidating Debtor in the ordinary course of business.

The Debtor will remain responsible for the preparation and filing of the Forms 1120 for the tax years 2025 and 2026. Therefore, the Debtor will incur additional expenses in order to properly complete this wind down. Debtor has estimated additional fees and costs of approximately $6,000.00 to complete the two (2) tax returns and the final accounting that will be required.

The Debtor's projections and wind down cost, anticipated through December 31, 2026, are attached as **Exhibit B.**

## ARTICLE VI
## TAX CONSEQUENCES

Debtor is unable at this time to fully determine the effect that the proposed Liquidating Plan will have upon its tax attributes. Since the Debtor is liquidating and will be filing a final corporate income tax return for the tax year 2026, the Debtor does not anticipate consequential income tax implications from the

discharge of any of its debt due to this bankruptcy proceeding. Debtor recommends that the Creditors consult their tax specialist relative to the tax consequences of the Plan to the Creditors.

No ruling has been sought or obtained from the IRS with respect to any of the tax aspects of the proposed Plan and no opinion of counsel has been obtained by the Debtor with respect thereto. No representations or assurances are being made with respect to the federal income tax consequences as described herein. Certain types of claimants and interest holders may be subject to special rules not addressed in this summary of federal income tax consequences.

## ARTICLE VII
## DISCHARGE

Section 1141(d)(3) provides that the confirmation of a plan does not discharge a debtor if the plan provides for the liquidation of all or substantially all of the property of the estate. 11 U.S.C. § 1141(d)(3)(A). Consequently, the Debtor confirmation of this Plan shall not discharged the Debtor from its prepetition debt.

## ARTICLE VIII
## CONSEQUENCES OF DENIAL OF CONFIRMATION OF PLAN

If the Court fails to confirm the Plan, this Chapter 11 proceeding may continue, and the Debtor may seek confirmation of an amended or modified Plan.

Alternatively, the Debtor's Chapter 11 case may be converted to a Chapter 7 liquidation case or this proceeding may be dismissed.

## ARTICLE IX
## VOTING AND RIGHT OF WITHDRAWAL

### 9.1 Voting Procedures

Under the Bankruptcy Code, the only classes that are entitled to vote to accept or reject a plan are classes of claims, or equity interests, which are impaired under the plan. Accordingly, classes of claims or interests that are not impaired are not entitled to vote on the plan.

Creditors that hold claims in more than one (1) impaired class are entitled to vote separately in each class. Such a creditor will receive a separate ballot for all its claims in each class (in accordance with the records of the Clerk of the Court) and should complete and sign each ballot separately. A creditor who asserts a claim in more than one (1) class and who has not been provided with enough ballots may photocopy the ballot received and file multiple ballots.

Votes on the plan will be counted only with respect to claims: (a) that are listed on the Debtor's Schedules of Assets and Liabilities other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the bar date set by the Court for the filing of proofs of claim (except for certain claims expressly excluded from that bar date or which are allowed by Court order).

However, any vote by a holder of a claim will not be counted if such claim has been disallowed or is the subject of an unresolved objection, absent an order of the Court allowing such claim for voting purposes pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3018.

Voting on the plan by each holder of a claim or interest in an impaired class is important. After carefully reviewing the plan and disclosure statement, each holder of such a claim or interest should vote on the enclosed ballot either to accept or to reject the plan, and then return the ballot by mail to the Debtor's attorney by the deadline previously established by the Court.

Any ballot that does not appropriately indicate acceptance or rejection of the plan will not be counted.

A ballot that is not received by the deadline will not be counted.

If a ballot is damaged, lost, or missing, a replacement ballot may be obtained by sending a written request to the Debtor's attorney.

**9.2 Acceptance.**

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by the holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots. The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the

equity interests of that class that actually cast ballots. If no creditor or interest holder in an impaired class votes, then that class has not accepted the plan.

**9.3 Withdrawal.**

Debtor reserves the right to withdraw, otherwise amend, or modify this Plan prior to confirmation to the extent permitted by 11 U.S.C. §1193.

## ARTICLE X
## DEFINITIONS

As used in this Plan, the following terms shall have the meanings specified below, unless the context requires otherwise:

**10.1** "Administrative Claim" means costs and expenses of administration of the Case allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, and the fees of the United States Trustee under 28 U.S.C. § 1930(a)(6).

**10.2** "Administrative Creditor" shall mean any Creditor entitled to payment of an Administrative Expense.

**10.3** "Allowed Claim" or "Allowed Interest" means a Claim against or Interest in the Debtor to the extent that:

A. A Proof of Claim or Interest was:

1. Timely filed;

2. Deemed filed pursuant to section 1111(a) of the Code; or

3. Filed late with leave of the Bankruptcy Court after notice and an opportunity for hearing given to Debtor, and counsel for Debtor; and

B. The Claim is not a Contested Claim or a Contested Interest, or

C. The Claim is allowed (and only to the extent allowed) by a Final Order of the Bankruptcy Court.

**10.4** "Avoidance Actions" means all claims granted to the Debtor or Liquidating Debtor under sections 544–53 of the Code.

**10.5** "Ballot" shall mean the official Bankruptcy Form No. 14, or a document prepared to substantially conform to same being sent to all Creditors and parties-in-interest entitled to vote for or against the Plan.

**10.6** "Bankruptcy Code" or "Code" means the Bankruptcy Reform Act of 1978, as amended (11 U.S.C. §§ 101, et seq.).

**10.7** "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan and any court having jurisdiction over any appeals.

**10.8** "Bankruptcy Rules" or "Rules" means the Federal Rules of Bankruptcy Procedure, as promulgated by the Supreme Court that became effective on August 1, 1991 and any amendments thereto. To the extent applicable, Bankruptcy Rules also refers to the Local Rules of the U.S. District

Court for the Eastern District of Michigan, as amended and the Local Bankruptcy Rules for the Eastern District of Michigan, as amended.

**10.9** "BoAA" means the Bank of Ann Arbor, a Michigan chartered community bank.

**10.10** "Bridge" means Bridge Business Credit, LLC, a Michigan limited liability company.

**10.11** "Business Day" means any day, other than a Saturday, Sunday, or "Legal Holiday," as that term is defined in Bankruptcy Rule 9006(a).

**10.12** "Case" or "Chapter 11" means the case currently pending before the United States Bankruptcy Court for the Eastern District of Michigan styled as *In re Diversified Wire & Cable, Inc.* (Case No. 26-42623-mlo).

**10.13** "Claim" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, contested, disputed, undisputed, legal, equitable, secured, or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, contested, disputed, undisputed, secured, or unsecured.

**10.14** "Class" means a class of holders of Claims or Interests described in Article III of this Plan.

**10.15** "Confirmation Date" means the date upon which the Bankruptcy Court shall enter the Confirmation Order.

**10.16** "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court with respect to the confirmation of the Plan.

**10.17** "Confirmation Order" means the order of the Bankruptcy Court, which confirms this Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

**10.18** "Contested Claim" means any Claim as to which Debtor or any other party in interest has interposed an objection or commenced an adversary proceeding in accordance with the Bankruptcy Code, Bankruptcy Rules and this Plan, which objection has not been determined by a Final Order.

**10.19** "Creditor" means any holder of a Claim against the Debtor.

**10.20** "Debtor" means Diversified Wire & Cable, Inc., a Michigan corporation.

**10.21** "Disbursing Agent" shall mean the Debtor. If the Debtor is unable to serve, then the Disbursing Agent shall be an individual selected by the Debtor from the current panel of Chapter 7 Trustees maintained by the Office of the United States Trustee or an appropriate individual acceptable to the Debtor.

**10.22** "DWC" shall mean the Debtor, Diversified Wire &* Cable, Inc.

**10.23** "Effective Date" shall mean the sixtieth (60th) business day after the Confirmation Order becomes a Final Order.

**10.24** "Final Order" means an Order of the Bankruptcy Court as to which (i) the time for appeal has expired and no appeal has been timely taken; or (ii) any timely appeal has been finally determined or dismissed; or (iii) an appeal has been timely taken, but such order has not been stayed within ten (10) days after the filing of such appeal.

**10.25** "Holder" shall mean a Person holding a Claim, Interest, or Lien, as applicable, with respect to the Debtor.

**10.26** "Impaired" means a Claim treated under this Plan, unless the Plan:

(a) leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest; or

(b) Notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default—

(1) cures any such default (other than defaults relating to (i) any penalty interest rate or provision arising from a non-monetary default by the Debtor; (ii) the solvency or financial condition of the Debtor; or (iii) the commencement of this Case) that occurred before or after the commencement of the Case;

(2) Reinstates the maturity of such Claim or Interest, as such maturity existed before such default;

(3) compensates the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance on such contractual provision or such applicable law; and

(4) Does not otherwise alter the legal, equitable, or contractual rights to which such Claim or Interest entitles its holder.

**10.27** "Insider" means each Dean J. Stanton, Susan Stanton, Dean G. Stanton, Jr., Andrew Stanton and Oacar A. Ferrari.

**10.28** "Insiders" means, collectively, the Insiders.

**10.29** "Interest" means the interests of Debtor as defined in the Code.

**10.30** "Interest Rate" means (a) with respect to Claims entitled to interest under section 506 of the Bankruptcy Code and this Plan and having an applicable contractual rate of interest, the lowest rate of interest provided in such contract, without regard to any default by Debtor, (b) with respect to all other Claims entitled to interest under the Bankruptcy Code and this Plan, the Prime Rate of Interest as of the Confirmation Date, or (c) with respect to (a) or (b) such other interest rate as may be determined by a Final Order of the Bankruptcy Court.

**10.31** "Liquidating Debtor" shall mean Diversified Wire & Cable, Inc., to the extent it continues to exist to implement the terms of this Plan after the Effective Date.

**10.32** "Petition Date" means the date the Debtor filed this case, which date is March 12, 2026.

**10.33** "Plan" or "Liquidating Plan" means this Liquidating Plan, as it may be altered, amended, modified, or supplemented from time to time.

**10.34** "Priority Claim" means a Claim entitled to priority under any section of the Bankruptcy Code except claims specified in section 507(a)(1) of the Code.

**10.35** "Professional Fees" means the fees and reimbursement for disbursements owed to attorneys, accountants, or other professionals of the Debtor whose employment has been approved by the Bankruptcy Court.

**10.36** "Secured Claim" shall mean a Claim secured by a lien on property in which the Estate has an interest but only to the extent of the value of the Creditor's interest in the Estate's interest in such property as of the Petition Date and only if such Secured claim is Allowed.

**10.37** "SStanton" means Susan K. Stanton, as the Trustee of the Susan K. Stanton Revocable Living Truste UAD 11/3/2015, as amended.

**10.38** "Subchapter V Trustee" shall mean Deborah Fish.

**10.39** "TCH" means Tripathi Capital Holding, LLC, a Michigan limited liability company.

**10.40** "Unsecured Claim" means a Claim that is not a Secured Claim and is not an Administrative Claim or a Priority Claim.

**10.41** "Unsecured Creditor" shall mean any Creditor that holds an Unsecured Claim.

## ARTICLE XI
## EFFECT OF CONFIRMATION

**11.1** Confirmation of the Plan shall modify and alter the rights of all Creditors and holders of Interests as provided herein on the Effective Date. Creditors or holders of Interests shall be prohibited from asserting any further claims against the property of the Debtor based upon any act, transaction, or indebtedness which is the subject matter of any Claim or Interest, or based upon any guarantee of collection, payment or otherwise made by the Debtor as to any obligation of any persons, firm or entity, unless the Plan provides, or the Court specifically orders otherwise. On the Effective Date, the assets of the Debtor not otherwise transferred prior to the Effective Date, shall re-vest in the Liquidating Debtor.

**11.2** On and after the Effective Date, the Liquidating Debtor shall continue the wind down process in the ordinary course under the terms of this Plan and applicable non-bankruptcy law to the extent such wind down is not completed prior to the Effective Date. The Debtor and Liquidating Debtor shall be authorized to incur the expenses as set forth in **Exhibit B** and as required to meet its non-bankruptcy law obligations.

**11.3** Except as otherwise provided in the Plan, pursuant to the application provisions in the Bankruptcy Code, including, but not limited to, section 553, and

non-bankruptcy law or agreement of the parties, and except in the case of the Group II Claim, Debtor and/or Liquidating Debtor may set-off against any Allowed Claim and distributions to be made with respect to such allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtor and/or Liquidating Debtor may hold against the Holder of such Allowed Claim or such Holder's predecessor-in-interest, as applicable, Claimant.

## ARTICLE XII
## MODIFICATION OF THE PLAN

**12.1** After confirmation, the Debtor and Liquidating Debtor may, with leave of the Bankruptcy Court, and upon notice and opportunity for hearing to the affected Creditor(s) only, remedy any defect or omission, reconcile any inconsistencies in the Plan or in the Confirmation Order or otherwise modify the Plan.

**12.2** Only if the Bankruptcy Court determines that the modification affects all the Creditors, or if the Debtor and Liquidating Debtor proposes a material modification affecting all Creditors, shall such modification be governed by section 1127 of the Bankruptcy Code.

## ARTICLE XIII
## JURISDICTION OF THE COURT

**13.1** Notwithstanding confirmation of the Plan, the Bankruptcy Court shall retain jurisdiction for the following purposes:

A. To determine all objections to the allowance of Claims;

B. To approve or disapprove any compromise by the Debtor of any Claim;

C. To determine all disputes arising under the Plan, including any dispute over any action taken by the Disbursing Agent, and to enforce, interpret and administer the terms and conditions of the Plan;

D. To determine any applications for allowance of compensation and reimbursement of expenses as may be required for pre-confirmation services;

E. To determine any applications for rejection, assumption, or assignment of executory contracts and the allowance of any claims resulting from the rejection thereof or from the rejection of executory contracts pursuant to the Plan;

F. To determine any applications, adversary proceedings, and contested and litigation matters pending in the Case at the Confirmation Date or thereafter filed;

G. To determine any applications on file for approval of settlement agreements and entering and enforcing all appropriate orders in connection therewith;

H. To modify any provisions of the Plan pursuant to the Rules, the Code and provisions of the Plan;

I. To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

J. To determine such other matters provided in the Confirmation Order as may, from time to time, be authorized under the provisions of the Code or any applicable law;

K. To enforce all orders, judgments, injunctions, and rulings in connection with this proceeding; and

L. To enter such orders that may be necessary or appropriate to aid in confirmation and to facilitate implementation of the Plan.

## ARTICLE XIV
## TITLE TO PROPERTY

**14.1** All property of the Debtor and Debtor in Possession not transferred prior to the Effective Date shall vest in the Liquidating Debtor on the Effective Date. The Debtor shall be discharged from its status as Debtor and Debtor in Possession and the affairs and business of the Debtor shall thereafter be conducted without Court involvement except as may be governed by Articles XII, XIII, and XIV of this Plan.

## ARTICLE XV
## PROOFS OF CLAIMS/OBJECTIONS TO CLAIMS

**15.1** The Court set a deadline of July 13, 2026, as the bar date for non-governmental proofs of claim to be filed with the Court. Governmental units are to file proofs of claim by October 13, 2026. Except as otherwise set forth in this Plan as an Allowed Claim, the Debtor and Liquidating Debtor may object to the allowance of any Claim, whether listed on the schedules filed by Debtor or filed by any Creditor, on or before the later of (a) sixty (60) days from the date of service of

any Proof of Claim upon the Debtor or Liquidating Debtor, or, (b) sixty (60) days after the Effective Date.

**15.2** Any Creditor asserting an unpaid administrative claim on the Confirmation Date shall file a request for such administrative claim within 30 days of the entry of the Confirmation Order.

## ARTICLE XVI
## DEFAULT

**16.1** Upon the failure of the Debtor or Liquidating Debtor to make any payment due under this Plan which is not cured within thirty (30) days of the mailing of a written notice of default by the Creditor, such Creditor may seek appropriate relief from this Court.

## ARTICLE XVII
## MISCELLANEOUS PROVISIONS

**17.1** Except as otherwise set forth in this Plan, the Debtor and Liquidating Debtor each have standing to pursue any and all Avoidance Actions on the behalf of creditors, to the extent such exist and it is in the Debtor's and the Liquidating Debtor's sound business judgment whether to pursue or waive such actions.

**17.2** Any Professional Fees incurred by any professional whose employment required the approval of the Bankruptcy Court during the pendency of the Case, shall from and after the Confirmation Date be paid by the Debtor and Liquidating Debtor without the prior review and approval of the Bankruptcy Court.

Notwithstanding any provision of the Bankruptcy Code or Rules, including without limitation Fed. R. Bankr. P. 2016, after the Confirmation Date no professional shall be required to disclose payments received from the Debtor or Liquidating Debtor for services provided after the Confirmation Date. All fees and expenses arising after the Confirmation Date shall be billed directly to the Debtor and Liquidating Debtor and the Bankruptcy Court shall only review that portion to which the Debtor and Liquidating Debtor object prior to the closing of the cases. The Debtor and Liquidating Debtor shall pay, in accordance with the terms of any invoice with respect to such fees, the portion as to which there is no objection.

**17.3** Notwithstanding anything in this Plan to the contrary, the Debtor and Liquidating Debtor shall not be obligated to make any payments towards any Contested Claim. Further, the Debtor shall not be required to make any payments for an Allowed Claim to any Creditor if the Debtor has filed a motion, objection, adversary proceeding, state court proceeding or other similar notice against such Creditor before the Confirmation Date alleging an objection, claim, cause of action, offset or counter-claim, such that if sustained and not paid by such Creditor would result in a disallowance of such Allowed Claim in accordance with section 502(d) of the Bankruptcy Code.

**17.4.** All parties in interest, including without limitation any Creditor, shall be required to execute any document reasonably requested by the other to

memorialize and effectuate the terms and conditions of this Plan. This shall include without limitation any execution by Creditors of any UCC or mortgage terminations and releases.

**17.5.** When the Debtor, Liquidating Debtor or the Disbursing Agent have made all payments and met all obligations required under this Plan all restrictions, negative covenants and other limitations on the Debtor and Liquidating Debtor shall terminate.

**17.6.** Any lien or encumbrance of any Creditor, which is not specifically preserved by this Plan, shall, and hereby on the Effective Date is, extinguished, released and terminated. Any Creditor holding such a lien or encumbrance shall be required to execute any document reasonably requested by the Debtor and Liquidating Debtor to memorialize said termination. If a Creditor fails to cooperate with the Debtor, the Debtor may seek to enforce this provision within the Bankruptcy Court or, at the Debtor's or Liquidating Debtor's option, the Debtor may file a certified copy of the Confirmation Order and a copy of this Plan with the appropriate register of deeds or Secretary of State's office and the filing of the certified Confirmation Order and this Plan shall serve to terminate such lien or encumbrance.

**17.7.** This Plan and the Confirmation Order shall inure to the benefit of, and be binding upon, all parties in interest and their respective successors and assigns.

**DIVERSIFIED WIRE & CABLE, INC., LLC,** a Michigan corporation

By: /s/ Dean J. Stanton
Dean J. Stanton
Its: Chief Executive Officer

**STROBL STARK PLLC**

Dated: June 10, 2026

By: */s/ Lynn M. Brimer*
LYNN M. BRIMER (P43291)
PAMELA S. RITTER (P47886)
EVAN H. KAPLOE
Attorneys for Debtor
33 Bloomfield Hills Parkway, Suite 125
Bloomfield Hills, MI 48304
Tele: (248) 540-2300; Fac.. (248) 645-2690
E-Mail: lbrimer@strobllaw.com
pritter@strobllaw.com
ekaploe@strobllaw.com

*S&B\85030\010**BANKRUPT**\SB954720.DOC